IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| REI HOLDINGS, LLC fka NEFF COMPANIES, LLC dba REI HOLDINGS, a Utah limited liability company<br><br>Plaintiff,<br><br>v.<br><br>LIENCLEAR – 0001, LLC, a Delaware limited liability company, BCMG, LLC a Puerto Rico limited liability company; BFNH, LLC, a Delaware limited liability company; BLOXTRADE, LLC a Puerto Rico limited liability company; TOM MCOSKER, an individual; DONALD BYRNE, an individual; BEN EDWARRDS, an individual; OPTIMUM ASSET MANAGEMENT, LLC, a North Carolina limited liability company; DAN FRIEDMAN, an individual; 111 WHITNEY AVENUE, INC. dba THE MARCUS LAW FIRM, a Connecticut Corporation<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS<br><br>Case No. 2:17-cv-00564<br><br>Judge Clark Waddoups |

## **INTRODUCTION**

Before the court are the motions to dismiss filed by Defendants [1] the Marcus Law Firm, [2] The Optimum Defendants and [3] the LienClear Defendants. As explained below, the court grants each motion for lack of personal jurisdiction.

**BACKGROUND**

Plaintiff REI Holdings, LLC (REI) "is a Utah limited liability company with its principal place of business in the state of Utah." (Am. Compl. ¶ 1, ECF No. 5 at 2.) "REI is in the business of purchasing portfolios of tax lien certificates issued by municipalities across the country." (Am. Compl. ¶ 14, ECF No. 5 at 3.) Brandon Neff (Neff) is "a principal at . . . REI." (Neff Aff. ¶ 2, ECF No. 36-1 at 3.) REI complains that the defendants were involved in REI's purchase of lien certificates that they knew had little or no value.

This case involves defendants belonging to three groups—[1] the Marcus Law Firm [2] the Optimum Defendants; and [3] the LienClear Defendants. The court dicusses each group of defendants in turn.

<u>The Marcus Law Firm</u>

The Marcus Law Firm (Marcus) is a "proprietorship with Edward L. Marcus as the owner of the law firm." (ECF No. 34 at 2.) Marcus' "sole office [is] located in . . . Connecticut." (Marcus Aff. ¶ 8 ECF No. 24-1 at 4.) Marcus "represented REI in several lien foreclosure matters in the state of Connecticut." (ECF No. 32 at 3.) More specifically, Marcus "was retained by [Defendant] Optimum and [REI] to assist in the purchase of tax lien portfolios for properties in . . . Connecticut." (Marcus Aff. ¶ 16, ECF No. 24-1 at 4.) Marcus' "role in the transaction was to act as an Escrow Agent for the transfer of funds, assist in obtaining licensing from the State of Connecticut Banking Department, and to assist in filing records with municipalities in Connecticut." (Marcus Aff. ¶ 16, ECF No. 24-1 at 4–5.) Marcus attorneys "performed all of the work for [Defendant] Optimum and [REI] in Connecticut . . . ." (Marcus Aff. ¶ 16, ECF No. 24-1 at 5.) "All money paid to [Marcus] as compensation for its worked performed was paid to [Marcus] in Connecticut." (Marcus Aff. ¶ 16, ECF No. 24-1 at 5.) "All money placed with

[Marcus] in its capacity as an Escrow Agent was done so in Connecticut." (Marcus Aff. ¶ 16, ECF No. 24-1 at 5.) But, "in the course of its legal representation of REI," "[r]epresentatives of [Marcus] . . . collectively directed at least over six (6) dozen emails to REI" in Utah. (ECF No. 32 at 2.)

## The Optimum Defendants

"Defendant Optimum is a limited liability company with its principal place of business in the State of North Carolina . . . ." (Am. Compl. ¶ 8, ECF No. 5 at 3.) "[T]he sole member of Optimum is [Dan] Friedman." (Am. Compl. ¶ 8, ECF No. 5 at 3.) Friedman "is domiciled in . . . North Carolina." (Am. Compl. ¶ 8, ECF No. 5 at 3.) Optimum represented REI as a tax lien servicer in the state of Connecticut." (Neff Aff. ¶ 5, ECF No. 36-1 at 3.)

In its Amended Complaint, REI alleges that "[i]n or around February, 2015 . . . Friedman and [another defendant] approached REI regarding the purchase of two (2) portfolios of tax lien certificates issued by the cities of Hartford, Bridgeport and West Haven, Connecticut (the 'Portfolios')." (Am. Compl. ¶ 15, ECF No. 5 at 3-4.) "All of the tax liens upon which [REI] bases its claims against [the Optimum Defendants] concern[] property . . . located in the State of Connecticut." (Friedman Aff. ¶ 11, ECF No. 30-1 at 4.) The Amended Complaint does not say if Friedman approached REI in Utah or in another State. (*See* ECF No. 5 at 3–4.) But in his affidavit, Friedman provides that "[n]either Optimum nor I have ever traveled to Utah for the purpose of conducting business in that forum state." (Friedman Aff. ¶ 9, ECF No. 30-1.) And, Friedman further provides that "[n]either Optimum nor I have ever solicited business in the state of Utah." (Friedman Aff. ¶ 10, ECF No. 30-1.) Additionally, Friedman provides that "[t]he work and services provided by [the Optimum Defendants] in relation to the subject tax liens and agreement with REI . . . occurred primarily in North Carolina and Connecticut: however no work

3

or services provided by [the Optimum Defendants] . . . occurred in Utah." (Friedman Aff. ¶ 14, ECF No. 30-1.) Neff, in his affidavit, does not disagree with Friedman on these points. (*Compare* Friedman Aff. ECF No. 30-1 *with* Neff Aff. ECF 36-1.)

Neff asserts that "[a]s part of its representation," Optimum, through Friedman, "directed several dozen emails to REI with status updates, requests for information, procedural information, invoicing, and other related items concerning liens that REI purchased and the properties that they were attached to." (Neff Aff. ¶ 7, ECF No. 36-1 at 3.) And, "[o]n multiple occasions, Dan Friedman called into the REI office on a conference call to train REI's salespersons and administrative team on tax lien protocols in Connecticut." (Neff Aff. ¶ 9, ECF No. 36-1 at 7.) In his second affidavit, Friedman disputes Neff's allegation. (Friedman Aff. ¶ 7, ECF No. 37-1 at 2.) ("I have never provided a presentation or formal training to REI's salespersons and administrative team on tax lien protocols in Connecticut.")).

In its Amended Complaint, REI further alleges that Friedman and Optimum, "in concert with [the other Defendants,] deleted or concealed data from the Portfolios to hide material facts from REI and induce REI to purchase the Portfolio." (Am. Compl. ¶ 24, ECF No. 5 at 4–5.) In the Amended Complaint, REI does not allege whether Friedman's act of deleting and concealing this data occurred in Utah or in another state. (*See* ECF No. 5 at 4–5.) Nor does REI allege in which State this data was stored. But, in its Opposition to Optimum's Motion to Dismiss, REI does allege that Optimum "used a Utah Company, Onyx Websites, LLC [(Onyx)], to build and host [its] online presence and database." (ECF No. 36 at 6.) REI relies on hearsay statements in Neff's affidavit to support this allegation.

In his affidavit, Neff alleges that "Friedman told [Neff] that the company that built and hosted Optimum's tax lien web site and online database was located in Springville, Utah." (Neff

4

Aff. ¶ 10, ECF No. 36-1 at 7.) This company was Onyx. (Neff Aff. ¶ 10, ECF No. 36-1 at 7.) After learning about this connection, [Neff] met with managers of Onyx . . . and [they] discussed its services for Optimum." (Neff Aff. ¶ 10, ECF No. 36-1 at 7.) However, as Optimum points out in its Reply, Neff does not specifically identify those managers. Nor does he establish when or where this meeting occurred. And perhaps most importantly, he does not actually allege that Onyx *confirmed* in this meeting that it "built and hosted Optimum's tax lien website and online database." (Neff Aff. ¶ 10, ECF No. 36-1 at 7.) Rather, somewhat cryptically, he alleges that they simply "discussed [Onyx's] services for Optimum." (Neff Aff. ¶ 10, ECF No. 36-1 at 7.)

Friedman disputes that Optimum ever "had or maintained an online tax lien database" and contends that "Optimum . . . never contacted or retained the services of Onyx . . . ." (Friedman Aff. ¶ 7, ECF No. 37-1 at 4.) The president of Onyx, Sean Roylance (Roylance), sides with Friedman in this dispute. In his affidavit, Roylance testifies that "Onyx has neither hosted nor serviced a website or database for Dan Friedman, Optimum Asset Management, LLC or an Optimum-named entity." (Roylance Aff. ¶ 5, ECF No. 37-2 at 3.)

The LienClear Defendants

Defendant LienClear, LLC (LienClear) "is a Delaware limited liability company with its principal place of business in the State of New York." (Am. Compl. ¶ 1, ECF No. 5 at 2.) Defendant BFNH, LLC (BFNH), "is a Delaware limited liability company with its principal place of business in the State of Delaware." (Am. Compl. ¶ 3, ECF No. 5 at 2.) Ben Edwards, "who is domiciled in the State of New York," is "the sole member of BFNH." (Am. Compl. ¶ 4, ECF No. 5 at 2.) Defendant BCMG, LLC (BCMG) "is a Puerto Rico limited liability company . . . ." (Am. Compl. ¶ 2, ECF No. 5 at 2.) Donald Byrne (Byrne) and Tom McOsker (McOsker) are members of BCMG. (Am. Compl. ¶ 3, ECF No. 5 at 2.) McOsker is "domiciled in the territory

of Puerto Rico, while Byrne "is domiciled in the state of New York." (Am. Compl. ¶ 3, ECF No. 5 at 2.) Defendant BLOXTrade, LLC (BLOXTrade) "is a Puerto Rico liability company . . . ." (Am. Compl. ¶ 5, ECF No. 5 at 2.) The court refers to these defendants collectively as the "LienClear Defedants."

The crux of REI's allegations against the LienClear Defendants is that the LienClear Defendants, "[d]uring contract negotiations with REI . . . regarding the tax lien portfolios that are the subject of this action," (Neff Aff. ¶ 9,ECF No. 48-1) attempted to perpetuate "fraud on REI." (ECF No. 48 at 6.)

In its Amended Complaint, REI alleges that "[i]n or around February, 2015 [another defendant] and McOsker approached REI regarding the purchase of two (2) portfolios of tax lien certificates issued by the cities of Hartford, Bridgeport and West Haven, Connecticut (the 'Portfolios')." (Am. Compl. ¶ 15, ECF No. 5 at 3–4.) The Amended Complaint does not say if McOsker approached REI in Utah or in another state. (*See* ECF No. 5 at 3–4.) But in his affidavit, McOsker provides that he "never visited the State of Utah on behalf of the [LienClear Defendants] to negotiate or conduct any business with REI . . . ." (McOsker Aff. ¶ 7, ECF No. 45 at 2.) And, McOsker further provides that "[a]ny business transactions and negotiations involving [LienClear] and [REI] that are alleged in the Amended Complaint were conducted in Puerto Rico." (McOsker Aff. ¶ 14, ECF No. 45 at 3.) Neff, in his affidavit, does not dispute McOsker on this point. (*See* Neff Aff. ECF No. 48-1.) It therefore appears that McOsker "approach[ed]" REI in Puerto Rico.

REI, through Neff's affidavit, appears to allege that the LienClear Defendants "all contracted or participated in the contractual negotiations" "with REI . . . regarding the tax lien portfolios that are the subject of this action." (Neff Aff. ¶¶ 5,9 ECF No. 48-1 at 3.) "During

6

[these] contract negotiations . . . the [LienClear] Defendants . . . sent not less than three (3) dozen emails to REI in Utah with contract documents, status updates, requests for information, and response[s] to lien issues." (ECF No. 48 at 6.) "REI alleges this communication was directed to the state of Utah in an effort to perpetuate the fraud on REI." (ECF No. 48 at 6.) Neff also alleges that McOsker "call[ed] [him] well over one hundred times to discuss various transactions, actual and potential, between Neff, Companies, LLC and his entities." (Neff Aff. ¶ 11, ECF No. 48-1 at 7.)

## ANALYSIS

### I. Legal Standard

A defendant may move to dismiss a complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). When a defendant does so, the plaintiff bears the burden of establishing personal jurisdiction over the defendant. *Shrader v. Biddinger*, 633 F. 3d 1235, 1239 (10th Cir. 2011). Where, as here, the plaintiff seeks to establish personal jurisdiction "based on pleadings . . . and affidavits, that burden can be met by a prima facie showing." *Scrader*, 633 F.3d at 1239. "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995) (internal quotation marks omitted) (citation omitted). "If the parties present conflicting affidavits, all factual disputes must be resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Id.* (internal quotation marks omitted) (citation omitted).

"The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 134 S. Ct. 1115, 1121, 188 L. Ed. 2d 12 (2014). "The law of the forum state and constitutional due process

limitations govern personal jurisdiction in federal court." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017). "Utah's long-arm statute," Utah Code Ann. § 78B-3-201(3), " 'authorizes jurisdiction to the full extent of the federal constitution.' " *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 763 (10th Cir. 2011) (quoting *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.,* 618 F.3d 1153, 1159 (10th Cir.2010)). "The personal jurisdiction analysis here is thus a single due process inquiry." *Old Republic*, 877 F.3d at 903.

"Due process requires both that the defendant 'purposefully established minimum contacts within the forum State' and that the 'assertion of personal jurisdiction would comport with fair play and substantial justice.' " *Id*. (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). Personal jurisdiction may be either general or specific. REI, however, has not argued for general jurisdiction. Rather, REI argues that "the [c]ourt has specific personal jurisdiction over the Defendants." (ECF No. 36 at 3); (*see also* ECF No. 32 at 4; ECF No. 48 at 3.)

"Specific jurisdiction calls for a two-step inquiry." *Old Republic*, 877 F.3d at 904. First, the court asks "whether the plaintiff has shown that the defendant has *minimum contacts* with the forum state." *Id*. (emphasis added). "The minimum contacts test" itself "encompasses two distinct requirements." *Id*.

The minimum contacts test requires "(i) that the defendant must have purposefully directed its activities at residents of the forum state,[1] and (ii) that the plaintiff's injuries must

---

[1] The United States Court of Appeals for the Tenth Circuit has explained, however, that the "purposeful direction" requirement can appear "in different guises." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008). In contract cases, the question is "whether the defendant 'purposefully availed' itself of the privilege of conducting activities or consummating a transaction in the forum state." *Id*. Meanwhile, the question in the tort context is "whether the nonresident defendant 'purposefully directed' its activities at the forum state." *Id*. "In all events, the shared aim of 'purposeful direction' doctrine has been said by the Supreme Court to ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state. *Id.* (quoting *Burger King*, 471 U.S. at 475, 105 S. Ct. 2174).

8

arise out of the defendant's forum-related activities." *Id*. (citation omitted) (internal quotation marks omitted). "Purposeful direction may . . . be established . . . when an out-of-state defendant's intentional conduct targets and has substantial harmful effects in the forum state." *Old Republic* 877 F.3d at 907 (emphasis removed) (citing *Calder v. Jones*, 465 U.S. 783, 790–91, 104 S. Ct. 1482, 1488, 79 L. Ed. 2d 804 (1984)). This framework for determining purposeful direction is known as the "*Calder* effects test." *See id*. The Tenth Circuit has previously "summarized the *Calder* effects test to require three elements: '(a) an intentional action . . . that was (b) expressly aimed at the forum state . . . with (c) knowledge that the brunt of the injury would be felt in the forum state.' " *Old Republic*, 877 F.3d at 907. (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1072 (10th Cir. 2008).

Only if the court determines that minimum contacts exist does it turn to the second step of the specific jurisdiction inquiry—"whether the defendant has presented a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *See Old Republic*, 877 F.3d at 904.

Additionally, in intentional tort cases, "[t]he proper focus of the 'minimum contacts' inquiry" "is 'the relationship among the defendant, the forum, and the litigation.' " *Walden*, 134 S. Ct. at 1126. "It is the defendant, not the plaintiff . . . who must create contacts with the forum State." *Id*. Indeed, "a defendant's relationship with a plaintiff . . . standing alone, is an insufficient basis for jurisdiction. *Id*. at 1123.

## II. Motions to Dismiss

As noted above, before the court are motions to dismiss filed by each of the defendants. As explained in more detail below, the court grants each motion for lack of personal jurisdiction.

9

## A. Marcus' Motion

The court does not have personal jurisdiction over Marcus because REI has not shown that Marcus had minimum contacts with Utah. A close examination of *Newsome v. Gallacher*, 722 F.3d 1257 (10th Cir. 2013) is helpful to understand why the court does not have personal jurisdiction over Marcus.

In *Newsome*, the Tenth Circuit considered whether the defendants were "subject to personal jurisdiction in Oklahoma." 722 F.3d at 1261–62. The Tenth Circuit "analyze[d] the [defendant] law firm separately" from the other individual defendants.[2] *Id*. at 1266. Regarding the law firm, the question in *Newsome* was whether "out-of-state legal work on an out-of-state matter can subject an out-of-state lawyer to personal jurisdiction in the client's home forum." *Newsome*, 722 F.3d at 1280. The Tenth Circuit noted that "[c]ourts are split" on this question, and then explained the majority view and the minority view. *Id*. Under the minority view "normal communications that make up an active attorney-client relationship are the sort of repeated, purposeful contacts with the client's home forum sufficient to establish personal

---

[2] As to the individual defendants, the Tenth Circuit reversed the district court's decision to dismiss for lack of personal jurisdiction. *See Newsome*, 722 F.3d at 1281. The Tenth's Circuit holding regarding whether the individual defendants were subject to personal jurisdiction in Oklahoma was based, in part, on the Tenth Circuit finding that the individual defendants knew that the company that the Plaintiff was appointed to represent "operated exclusively in Oklahoma, making Oklahoma the focal point of any tort against" that company. *Id*. at 1269. For this reason, the Tenth Circuit held that the individual defendants had "expressly aimed their actions at Oklahoma when they acted toward" the Oklahoma company. *Id*.

As discussed below, the court holds that REI has not shown that the Optimum Defendants and the LienClear Defendants purposefully directed their activities at Utah. This court's holding is not inconsistent with the Tenth Circuit's holding in *Newsome* regarding the individual defendants. Unlike the Oklahoma company in *Newsome* that operated "exclusively" in Oklahoma, REI is in the business of purchasing portfolios of tax lien certificates issued by *municipalities across the country*." (Am. Compl. ¶ 14, ECF No. 5 at 3 (emphasis added).) In other words, REI does not operate exclusively in Utah. Alternatively, the Tenth Circuit's statement that "Oklahoma [was] the focal point of any tort against" the company because the individual defendants knew the company operated exclusively in Oklahoma" may no longer be good law after *Walden v. Fiore*, 571 U.S. 277, 284 134 S. Ct. 1115, 1122, 188 L. Ed. 2d 12 (2014). *See Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802 (7th Cir. 2014) ("after Walden there can be no doubt that 'the plaintiff cannot be the only link between the defendant and the forum.' *Walden,* 134 S.Ct. at 1122. Any decision that implies otherwise can no longer be considered authoritative.").

jurisdiction." *Id*. But under the majority view, "an out-of-state attorney working from out-of-state on an out-of-state matter does not purposefully avail himself of the client's home forum's laws and privileges, at least not without some evidence that the attorney reached out to the client's home forum to solicit the client's business." *Id*. at 1280-81. The Tenth Circuit rejected the minority view and adopted the majority view. *Id*. That difference determines the outcome in Marcus' Motion.

In *Newsome*, a corporation operating exclusively in Oklahoma hired a Canadian law firm. *See id* at 1279. The law firm facilitated a transaction that was "negotiated, arranged, closed, [and] documented" outside of Oklahoma—the forum state in that case. *Id.* And the law firm "performed all of its services" outside of Oklahoma. *Id*. at 1279. Notably, the law firm "never reached out to" the corporation in Oklahoma. *Id*. at 1281. But the law firm did facilitate "liens placed on Oklahoma property . . . ." *Id*. After adopting the majority view, the Tenth Circuit held that the "law firm did not purposefully direct its efforts at" the plaintiff in the forum state and held that the district court "properly dismissed the law firm for lack of personal jurisdiction." *Id*. at 1281.

Here, as in *Newsome*, REI has not alleged that Marcus reached out to REI in Utah to solicit business. *See* (ECF Nos. 5, 24-1 at 4, ¶¶ 10-11; 13–14.) REI also has not identified any work that Marcus performed while present in Utah. Any argument that Marcus purposefully directed its activities at the forum state is weaker here than in *Newsome*. In *Newsome*, the law firm facilitated the placement of liens on property in the forum state. *Newsome*, 722 F.3d at 1279. Here, REI does not dispute that Marcus' work centered on legal representation of REI in purchasing Connecticut tax lien portfolios. Nor does REI dispute that Marcus' attorneys

11

performed this work in Connecticut. (*Compare* Marcus Aff. ¶ 16, ECF No. 24-1 at 5 *with* Neff Aff., ECF No. 36-1.)

It is also important that REI has not alleged that Marcus has directed any other connections to Utah. Marcus does not have employees, property, or accounts in Utah. Nor does Marcus advertise, solicit business, or pay taxes here. Instead, REI attempts to avoid dismissal by focusing on Marcus' communications with REI. Notably, there are no alleged communications by Marcus with other Utah clients.

REI argues that Marcus' communications with REI in Utah, and REI's injury in Utah, establish "the requirements for personal jurisdiction." (ECF No. 32 at 8.) REI alleges that Marcus "sent not less than six . . . dozen emails to REI in Utah with status updates, requests for information, and procedural information." (ECF No. 32 at 7.) REI further "alleges this communication was directed to the state of Utah in an effort to perpetuate the fraud on REI." (ECF No. 32 at 8.) REI argues that these actions "show contact created by [Marcus] that [was] directed at the forum state . . . ." (ECF No. 32 at 8.) And REI further argues that "[t]he brunt of the injury—the financial repercussions—have been felt by Plaintiff in Utah." (ECF No. 32 at 8.)

The Tenth Circuit's adoption of the majority view requires this court to reject REI's arguments. *Newsome* embraces the majority view that "even though a client may feel the effects of the lawyer's misdeeds in the client's home forum, the client cannot sue the lawyer there on that account alone." *Id*. The Tenth Circuit's reasoning in *Newsome* is consistent with the "[w]ell-established principles of personal jurisdiction" that the Supreme Court outlined in *Walden*. 134 S. Ct. at 1126. "It is [Marcus], not [REI] . . . who must create contacts with the forum State." *Id*. "[REI] has [failed to] show that [Marcus] ha[d] minimum contacts with [Utah]." *Old Republic* 877 F.3d at 904. Marcus' "relationship with [REI] . . . standing alone, is an insufficient basis for

jurisdiction." *Walden*, 134 S. Ct. at 1123. Just like the law firm in *Newsome*, Marcus did not "purposefully direct its efforts" at Utah. *See Newsome* 722 F.3d at 1281. REI selected an out of state lawyer to assist it in out of state transactions, having no connection to Utah. Any contacts by Marcus with REI in Utah were only incidental to that representation. Under the Due Process Clause of the Fourteenth Amendment, the court cannot exercise personal jurisdiction over Marcus. Marcus' Motion to Dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) is GRANTED.[3]

### B. Optimum Defendants' Motion

The court does not have personal jurisdiction over the Optimum Defendants because REI has not shown that the Optimum Defendants established minimum contacts with Utah. REI has failed to show that the Optimum Defendants purposefully directed their activities at Utah.

#### 1. Purposeful Direction

In support of its position, REI relies on the *Calder* effects test.[4] (*See* ECF No. 36 at 4-6.) In *Calder*, the Court explains the requirements to establish purposeful direction. *See Dudnikov*

---

[3] **Venue; Process; and Service of Process**
The court lacks personal jurisdiction over the Optimum Defendants; therefore, the court declines to determine whether the District of Utah is the proper venue for this litigation. *See Walden*, 134 S. Ct. at 1121, n.5 (declining to address venue after finding the district court lacked personal jurisdiction over the defendant). Similarly, the court declines to determine whether process and service of process were insufficient.

[4] REI relies on the *Calder* effects test. (*See* ECF No. 36 at 4 ("With respect to intentional torts, such as fraud, Courts apply an "effects test, which looks to whether the defendant (1) committed an intentional act; (2) expressly aimed at the forum state; (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered in the forum state."); *see also* ECF No. 36 at 5 ("Plaintiff has alleged an intentional tort against Optimum."); *see also* ECF No. 36 at 6 ("These actions of Defendant meet the requirements of personal jurisdiction. They show contact created by Defendant that [was] directed at the forum state through email and telephone calls. The brunt of the injury—the financial repercussions—have been felt by Plaintiff in Utah.").)

"While [the court] [does] not imagine that *Calder* necessarily describes the only way to satisfy the purposeful direction test, because [REI] assert[s] it provides the key to unlocking the courthouse door for them, [the court] [is] able to limit [its] attention in this case to *Calder*'s demands." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008).

514 F.3d at 1072. The Tenth Circuit has referred to the *Calder* effects test more generally as the *Calder* harmful effects framework. *See Old Republic*, 877 F.3d at 917. As explained in more detail below, the court finds that REI has not established purposeful direction under the *Calder* framework. To do so REI is required to show (i) an intentional action; that (ii) was expressly aimed at the forum state; with (iii) knowledge that the brunt of the injury would be felt in the forum state.

      i. <u>Intentional Act</u>

For the purposes of this motion, the court assumes the Optimum Defendants acted intentionally in committing their alleged tortious conduct.

      ii. <u>Expressly Aimed at the Forum State</u>

To satisfy the "express aiming" test, REI must show that the defendant's tortious conduct was expressly aimed at the forum state itself. *See Dudnikov*, 514 F.3d at 1074 n. 9 ("Some courts have held that the 'expressly aimed' portion of *Calder* is satisfied when the defendant 'individually targets a known forum resident.' We have taken a somewhat more restrictive approach, holding that the forum state itself must be the 'focal point of the tort.' " (citations omitted)); *see also Walden*, 571 U.S. at 285 (The Supreme Court's 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."). The Tenth Circuit's holding is rooted in *Calder*, where the Supreme Court "emphasized that [the forum state] was the 'focal point' of the allegedly *tortious story*." *Id.* at 1074. (emphasis added) (citation omitted). Admittedly, "there is some overlap between this test and *Calder's* additional requirement . . . that a defendant must know that the 'harm was suffered' in the forum state." *Id.* at 1074-75. "But the overlap is far from complete, as the 'express aiming' test focuses more on a defendant's intentions—where was the 'focal point' of

14

its purposive efforts—while the latter requirement concentrates on the consequences of the defendant's actions—where was the alleged harm actually felt by the plaintiff." *Id*.

In its efforts to prove personal jurisdiction, REI has relied on various acts by the Optimum Defendants. For purposes of clarity, the court separates these acts into three distinct categories. First, REI alleges that "[i]n or around February, 2015 . . . Friedman . . . approached REI regarding the purchase of" the Portfolios. (Am. Compl. ¶ 15, ECF No. 5 at 3–4.) Second, REI alleges that a Utah company, Onyx, "built and hosted Optimum's tax lien web site and online database." [5] (Neff Aff. ¶ 10; ECF No. 36-1 at 7.) Third, REI alleges that Friedman sent REI dozens of emails, and further alleges that Friedman trained REI employees over the phone during various conference calls. (Neff Aff. ¶¶ 7,9; ECF No. 36-1 at 3,7.) None of these three acts, together or separately, satisfy the "express aiming" test.

While REI alleges that Friedman approached REI in 2015 about the purchase of portfolios, (Am. Compl. ¶ 15, ECF No. 5 at 3–4) it fails to allege whether Friedman approached REI in Utah or in another State. (*See* ECF No. 5 at 3–4.) In his affidavit, however, Friedman testifies that "[n]either Optimum nor I have ever traveled to Utah for the purpose of conducting business in that forum state." (Friedman Aff. ¶ 9, ECF No. 30-1.) Further, Friedman states that "[n]either Optimum nor I have ever solicited business in the state of Utah." (Friedman Aff. ¶ 10, ECF No. 30-1.) REI does not dispute Friedman on these points. (*See* Neff Aff. ECF No. 36-1.) While the allegations in the complaint must be taken as true, that remains true only to the extent that allegations remain uncontroverted by the defendant's affidavits. *Wenz*, 55 F.3d at 1505. Friedman's approach to REI in 2015 fails to satisfy the "express aiming" test for at least two

---

[5] Friedman disputes that Optimum ever "had or maintained an online tax lien database" and contends that "Optimum . . . never contacted or retained the services of Onyx . . . ." (Friedman Aff. ¶ 7, ECF No. 37-1 at 4.) But because "the parties [have] present[ed] conflicting affidavits, all factual disputes must be resolved in [REI's] favor." *Wenz*, 55 F.3d at 1505.

reasons. First, REI fails to allege that Friedman's contact occurred in Utah. REI has therefore failed to establish that Optimum Defendant's initial approach was expressly aimed at Utah. Second, to the extent REI intended to suggest that Friedman's 2015 approach occurred via a telephone call, the court finds that Friedman's affidavit controverts any such allegation. (*See* Friedman Aff. ¶ 10, ECF No. 30-1.) Thus, it "need not be taken as true." *Wenz*, 55 F.3d at 1505.

The Onyx Website also fails to satisfy the "express aiming" test because REI has failed to allege that the website is related to the Optimum Defendants' tortious conduct. REI has alleged that Friedman and Optimum, "in concert with" "BCMG, BFNH, LienClear, McOsker, Byrne, [and] Edwards," "deleted or concealed data from the Portfolios to hide material facts from REI and induce REI to purchase the Portfolio." (Am. Compl. ¶ 24, ECF No. 5 at 4-5.) But REI has not specifically alleged that the data from the Portfolios was hosted on the web site. Nor has REI alleged that it retained the Optimum Defendants' services through the website. The Onyx Website does not satisfy the "express aiming" test because REI has not shown that the website is at all related to the "tortious story." *See Dudnikov*, 514 F.3d at 1074. In other words, the Onyx Website does nothing to support the notion that Utah was the "focal point" of the Optimum Defendants' "purposive efforts." *Id*. at 1075.

Finally, Friedman's emails and teleconferences also fail to satisfy the "express aiming" test. REI has not shown that Friedman's actions were expressly aimed at Utah. Rather, his actions were aimed at REI and REI's staff. But the Supreme Court has made clear that "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 285; *see also id*. at 286 ("a defendant's relationship with a plaintiff . . . standing alone, is an insufficient basis for jurisdiction."). REI does not dispute that the Optimum Defendants' work "in relation to the subject tax liens and agreement with REI . . . occurred primarily in North

16

Carolina and Connecticut." (Friedman Aff. ¶14, ECF No. 30-1). Nor does REI dispute that none of the Optimum Defendants' work "occurred in Utah." (Friedman Aff. ¶14, ECF No. 30-1). Similarly, REI does not dispute that the Optimum Defendants have never "traveled to Utah for the purpose of conducting business . . . ." (Friedman Aff. ¶10, ECF No. 30-1). Utah, as opposed to REI, was simply not "the focal point of the tort." *Dudnikov*, 514 F.3d at 1074 n.9. Friedman's phone calls and emails fail to satisfy the "express aiming" test.

The court finds that REI has not satisfied the "express aiming" test. REI has therefore not established purposeful direction under the *Calder* harmful effects framework. Without purposeful direction, there are no minimum contacts, and there is no personal jurisdiction. Under the Due Process Clause of the Fourteenth Amendment, the court cannot exercise personal jurisdiction over the Optimum Defendants. The Optimum Defendants' Motion to Dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) is GRANTED.[6]

### C. LienClear Defendants' Motion to Dismiss

The court does not have personal jurisdiction over the LienClear Defendants. REI has not shown that the LienClear Defendants established minimum contacts with Utah by purposefully directing their activities at Utah.

#### 1. Purposeful Direction

As it did with the Optimum Defendants, REI relies on the *Calder* effects test to support its position that the court has personal jurisdiction over the LienClear Defendants. (*See* ECF No.

---

[6] **Venue:** The court lacks personal jurisdiction over the Optimum Defendants; therefore, the court declines to determine whether the District of Utah is the proper venue for this litigation. *See Walden*, 134 S. Ct. at 1121, n.5 (declining to address venue after finding the district court lacked personal jurisdiction over the defendant).

48 at 5.) REI fails to satisfy the three elements of the Calder effects test: (i) an intentional action; that (ii) was expressly aimed at the forum state; with (iii) knowledge that the brunt of the injury would be felt in the forum state.

      i. <u>Intentional Act</u>

For the purposes of this motion, the court assumes the LienClear Defendants acted intentionally in committing their alleged tortious conduct.

      ii. <u>Expressly Aimed at the Forum State</u>

To satisfy the "express aiming" test, REI must show that the defendant's tortious conduct was expressly aimed at the forum state itself. The Tenth Circuit's holding is rooted in *Calder,* where the Supreme Court "emphasized that [the forum state] was the 'focal point' of the allegedly *tortious story*." *Id*. at 1074. (emphasis added) (citation omitted).

REI relies on two general LienClear acts to demonstrate personal jurisdiction. First, REI points to the LienClear Defendants' "emails to Utah." (ECF No. 48 at 6.) Second, REI points to McOsker's phone calls to Brandon Neff. (ECF No. 48 at 7.) These email and phone calls fail to satisfy the "express aiming" test. REI has not shown that the LienClear Defendants' actions were expressly aimed at Utah. Rather, their actions were aimed at REI, REI's staff, and Brandon Neff. But, as noted above, the Supreme Court has made clear that "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 285; *see also id*. at 286 ("a defendant's relationship with a plaintiff . . . standing alone, is an insufficient basis for jurisdiction."). REI does not dispute that "[a]ny business transactions and negotiations involving [LienClear] and [REI] that are alleged in the Amended Complaint were conducted in Puerto Rico." (*Compare* McOsker Aff. ECF No. 45 *with* Neff Aff. ECF No. 48-1.) Nor does REI dispute that McOsker "never visited the State of Utah on behalf of the [LienClear Defendants] to

18

negotiate or conduct any business with REI . . . ." (*Compare* McOsker Aff. ECF No. 45 *with* Neff Aff. ECF No. 48-1.) Utah, as opposed to REI, was simply not "the focal point of the tort." *Dudnikov*, 514 F.3d at 1074 n.9. The LienClear Defendants' phone calls and emails fail to satisfy the "express aiming" test.

The court finds that REI has not satisfied the "express aiming" test. REI has therefore not established purposeful direction under the *Calder* harmful effects framework. Without purposeful direction, there are no minimum contacts. Without minimum contacts, there is no personal jurisdiction. Under the Due Process Clause of the Fourteenth Amendment, the court cannot exercise personal jurisdiction over the LienClear Defendants. The LienClear Defendants' Motion to Dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) is GRANTED.[7]

## CONCLUSION

A. For the foregoing reasons, Marcus' Motion to Dismiss for lack of personal jurisdiction is hereby GRANTED. This action is dismissed without prejudice for lack or jurisdiction.

B. For the foregoing reasons, the Optimum Defendants' Motion to Dismiss for lack of personal jurisdiction pursuant is hereby GRANTED. This action is dismissed without prejudice for lack of jurisdiction.

C. The LienClear Defendants' Motion to Dismiss for lack of personal jurisdiction is hereby GRANTED. This action is dismissed without prejudice for lack of jurisdiction.

---

[7] **Motion to Dismiss Under the Doctrine of *Forum Non Convenies;* Motion to Dismiss for Failure to State a Claim:** The court lacks personal jurisdiction over the LienClear Defendants; therefore, the court declines to address the LienClear Defendants' Motions to Dismiss on other grounds.

Dated this Dated this 8th day of February, 2019.

BY THE COURT:

_____
CLARK WADDOUPS
United States District Court Judge